UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-14040-CR-MOORE/LYNCH

UNITED STATES OF AMERICA,

     Plaintiff,

v.

JOHN CHARLES WENDEHAKE,

     Defendant.

_____/



FILED by ___ D.C.

NOV 3 0 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA.

## REPORT AND RECOMMENDATION ON DEFENDANT'S REQUEST FOR COMPETENCY HEARING [D.E. #27] AND DEFENDANT'S MOTION TO SUPPRESS TESTIMONIAL AND PHYSICAL EVIDENCE [D.E. #35]

**THIS CAUSE** having come on to be heard for an evidentiary on November 28, 2006 in regards to the above referenced motions and this Court having received testimony, evidence and arguments of counsel, recommends to the District Court as follows.

1.     The Defendant has the burden in respect to the issue of his competency to stand trial. The Defendant is not claiming an insanity defense nor that he was incompetent at the time that the offense was allegedly committed. Rather, the Defendant alleges that based upon several factors, he is not competent to stand trial. The Defendant, in attempting to meet his burden, presented the testimony of two expert witnesses, Dr. Kramer and Dr. Arias. In response, the government presented the expert testimony of Dr. Landrum. Counsel for the government and counsel for the Defendant stipulated as to the qualifications of each of these experts. Therefore, this Court will not go into the background or qualifications of these particular expert witnesses.

2.     This Court will also address the competency issue separately from the suppression issue. The parties agreed that this Court can utilize as a factual basis in

respect to the Motion to Suppress, the facts set forth in the police reports admitted as Government's Exhibit 1 at this hearing and the facts as alleged in the government's response to the Motion to Suppress. Counsel for the Defendant argued that her client has been unable to provide her with any facts so she had no evidence to present to contradict the facts as set forth in the government's response which mirror the law enforcement reports, Government's Exhibit 1. Counsel for the Defendant did make certain that this Court understood that the Defendant was not stipulating to the search of his computer or the admissibility of any statements he made. The Defendant argued that his alleged incompetency impacted his ability to give a meaningful consent to search and/or make any statements. This Court will address those issues separately now.

COMPETENCY ISSUE

3.      This Court will address the testimony of each of the experts separately and will supplement their testimony with reference to their reports. The reports of the Defendant's experts were admitted into evidence at the hearing. The report of the government's expert Dr. Landrum, is made a part of the record as an attachment to [DE 43], Government's First Supplemental Response To The Standing Discovery Order.

DR. KRAMER

4.      Dr. Kramer was the first witness called by the Defendant. Dr. Kramer is a forensic psychiatrist. His report was admitted as Defendant's Exhibit 1 at this hearing.

5.      Dr. Kramer examined the Defendant on or about August 10, 2006. He found that the Defendant suffered from cognitive deficits specifically in the area of memory, concentration, overall awareness and perceiving/reacting to his environment. He also found that the Defendant suffered from a major depressive disorder without psychosis. Dr.

2

Kramer's opinion was that at the time he examined the Defendant, he was incompetent to stand trial based upon these conditions. Further, in respect to the Motion to Suppress, Dr. Kramer's report reflects that the Defendant's condition and limited judgment was "likely" to have an impact on the Defendant's decision to consent to a search.

6.     In formulating his opinion, Dr. Kramer reviewed the Sheriff's Office report and FBI reports which have been admitted as Government's Composite Exhibit 1 in this case. He also examined medical records from the Treasure Coast Rehabilitation Hospital from 1991. He also interviewed the Defendant's wife and the Defendant.

7.     In 1991, at age 16, the Defendant was involved in a car accident. The Defendant suffered several internal injuries as well as a closed head injury. The Defendant underwent orthopedic surgery shortly after the accident and remained in residential rehabilitation until April 26, 1991. Dr. Kramer's review of the medical reports reflect that at the time that the Defendant was discharged from the hospital he was displaying the greatest difficulty in terms of his visual processing and speed of response. He testified that the brain injury had improved significantly at the time of discharge, but he still had speech and visual problems as well as problems retaining/using information. These included problems with his short term memory.

8.     The Defendant is presently 32 years old having been born in March of 1974. The Defendant is married and has a minor child. The Defendant's wife told Dr. Kramer that he forgets things easily and that his intermediate memory for events may be impaired for things that occurred between one day and two weeks. She also told Dr. Kramer that the Defendant has had difficulty keeping jobs and has been fired from most of his jobs. She

3

told Dr. Kramer that when she met the Defendant, he was enrolled in community college taking computer courses, but he was unable to complete the program and dropped out.

9.     The Defendant is not taking any medications for his condition. Further, he has not received any treatment since his discharge in 1991.

10.    Dr. Kramer testified that the Defendant's short term memory problems impact his competency because he may not be able to use his memory to assist his attorney. It is Dr. Kramer's opinion that the Defendant would be unable to tell his attorney what occurred. Further, Dr. Kramer testified that the Defendant was not able to coherently complete any timeline as to what happened. Based upon all of this, Dr. Kramer believes that the Defendant is not able to assist his attorney at trial and could not coherently testify at trial.

11.    There are six areas Dr. Kramer gave an opinion on concerning the Defendant's condition and their impact on his competency. This Court will list each of these as follows:

a.     Dr. Kramer found that the Defendant is sufficiently able to appreciate the current charges against him.

b.     The Defendant is acceptably able to appreciate the possible penalties involved with the charges he is facing.

c.     The Defendant sufficiently understands the adversarial nature of the legal process and demonstrates a capacity for understanding the court proceedings.

d.     The Defendant can manifest appropriate courtroom behavior.

e.     The Defendant is not sufficiently able to assist in his own defense through his ability to disclose pertinent facts to his attorney.

4

    f.  The Defendant does not demonstrate sufficient capacity to testify relevantly.

  12.  These last two findings are the only competency areas in which he found the Defendant to be lacking.  Dr. Kramer states that the Defendant's difficulty with his intermediate and long term memory, and lack of concentration prevents him from being able to describe other than some spotty details of the circumstances surrounding the charges in this case. Dr. Kramer states that the Defendant was completely unable to recall the specific details or time frames.  The Defendant became somewhat confused when he was asked pointed questions.  In respect to testifying, Dr. Kramer stated in his report that the Defendant told him that he thought he would go blank if asked to testify.  Dr. Kramer's opinion is that the Defendant's memory and concentration problems would make it hard for him to testify.

  13.  Dr. Kramer testified that he would suggest that the Defendant obtain medications to treat his depression.  He was of the opinion that an anti-depressive medication may permit the Defendant to be competent after a period of time.  However, Dr. Kramer was unable to say how much of the Defendant's problems result from his depression or from his brain injury.

  14.  Dr. Kramer's report reflects that the Defendant had been in custody five months just prior to his examination. However, the Defendant has been out on bond and it was pointed out to Dr. Kramer that his report is inaccurate in that regard.  Further, his report reflects that the Defendant has worked as an assistant manager at Walgreen's, MacDonald's, Steak 'n Shake, Burger King and First Union Bank.  The Defendant claims that he has not been able to maintain a job for more than one year and generally was

terminated from these jobs because of his cognitive and emotional problems. The personal history of the Defendant reflects that he was a fairly good student and very sociable prior to his auto accident in 1991.

15.     Dr. Kramer found no evidence of malingering or false representation by the Defendant.     The Defendant told Dr. Kramer that he was only interested in adult pornography and did not recall receiving images or movies that were child pornography as charged in this case. The Defendant was not able to describe how often he had partaken in the activity of viewing pornography on line. The Defendant purportedly told Dr. Kramer that he had little recollection of when he was originally questioned by law enforcement. The Defendant told Dr. Kramer that he did not remember what the law enforcement officers said except that they wanted his computer and that his wife was at home where his computer was located.

16.     Dr. Kramer's report reflects that the Defendant was "overall cooperative at the interview even though he was apparently very depressed." His responses were generally coherent and rational. There was no evidence of any delusional beliefs or hallucinations. Dr. Kramer's report reflects that the Defendant's "cognitive capacity was mildly impaired." He finds that the Defendant is oriented to current date, place and situation. He is able to note his cell phone number as well as his address in Vero Beach. He is able to name the current president as well as three presidents from history. He is able to recall the contents of his last meal and a recent news story. Other tests that Dr. Kramer discussed in his report reflect the Defendant's ability to perform certain memory tasks adequately.

6

17.     In respect to the Motion to Suppress, Dr. Kramer testified at the hearing that the Defendant was "possibly depressed" at the time that he gave consent to law enforcement to search his computer and made statements to law enforcement. Dr. Kramer testified that "it is hard to say what the Defendant's state was at that time." He was of the opinion that when a person has difficulty processing information coupled with stress and depression, that this impacts one's ability to consent.

18.     Nevertheless, when asked specifically, Dr. Kramer stated on the record that he could not say for sure whether the Defendant would have been unable to consent to the search and make statements at the time that he was interviewed by law enforcement in October of 2005. Dr. Kramer suspects that his condition would have a large impact on his ability to consent, but is not sure in this regard.

19.     Dr. Kramer met with the Defendant a total of two hours. Since he is not a psychologist, he did not administer tests to determine malingering. However, he did discuss this with Dr. Arias, a neuropsychologist who administered those tests later to the Defendant and who testified at this hearing as well. Dr. Kramer's evaluation of the Defendant was based mostly on conversations with the Defendant. He finds that the Defendant's memory and processing of information are the main problems that he has.

20.     Dr. Kramer did admit that a review of the police reports, Government's Exhibit 1, do reflect that the Defendant gave the officers a detailed recollection of how he got into trouble and the surrounding facts. This Court will specifically discuss those facts in respect to the Motion to Suppress so that the District Court has an overall understanding of how the Defendant reacted and what he stated at the time he was first approached by law enforcement in October of 2005.

7

21.     Dr. Kramer also testified that at the time he interviewed the Defendant, it was his opinion that the Defendant was unable to assist with his defense, but not completely so. However, Dr. Kramer felt that the level at which the Defendant could assist his counsel was "unacceptable." Dr. Kramer agreed on cross-examination that by giving the Defendant more time to respond to questions, as suggested by the other experts who examined the Defendant, may help the Defendant and could result in acceptable competency to assist his counsel at trial. However, Dr. Kramer stated that he did not test for this in particular.

## DR. ARIAS

22.     Dr. Arias was the second expert to testify for the Defendant. He is a clinical psychologist. He performed a neuropsychological evaluation of the Defendant on or about September 8, 2006. Dr. Arias' report was admitted into evidence as Defendant's Exhibit 2. This Court will refer to certain sections of Dr. Arias' report in explaining his testimony.

23.     Dr. Arias testified that a neuropsychologist examines the relationship between the brain and behavior. He has done hundreds of examinations. He was asked to perform a neuropsychological evaluation of the Defendant in this case although he was not specifically asked to make a competency finding.

24.     The Defendant provided much of the information that Dr. Arias utilized in his examination. He confirmed that the Defendant is married and has a two year old daughter. At the time that he examined him, the Defendant was working as a toll booth collector. He confirmed that the Defendant told him he was previously an assistant manager at Walgreen's for five to six months, but was fired due to his arrest in this case. He also had worked previously as an assistant manager at MacDonald's, but could not remember how long he had worked there. He was also an assistant manager at a Burger King for several

8

months to a year, but was fired for not being productive. The Defendant told Dr. Arias that he worked as an assistant manager at a Radio Shack for one year, but did not remember the dates. He also was a sales associate and a bank manager, but could not remember the specific dates of employment. He told Dr. Arias that he dropped out of the 12th grade after his auto accident and later obtained his GED. He went to Keiser College to study computers and believes that he had approximately two years of college experience there. He lost interest in school and eventually dropped out of Keiser College.

25.     The facts relating to the motor vehicle accident are virtually the same as were described to Dr. Kramer. The Defendant had no recollection of the accident. Dr. Arias' report reflects that the Defendant received counseling at a rehabilitation center and follow up out-patient therapy to help him adjust to his injuries. This was only for a short period of time and there has been no significant followup treatment of any type concerning the Defendant's alleged memory or cognitive deficits.

26.     The Defendant told Dr. Arias that he does recall having some physical limitations and cognitive deficits which included forgetfulness, which slowly improved over time. The Defendant told Dr. Arias that he was unable to multi-task, could not retain information and was losing his train of thought.

27.     Dr. Arias also interviewed the Defendant's mother. She stated that before the traffic accident, the Defendant was a very social person and a very good student. Afterward, he dropped out of school and had problems with jobs.

28.     The Defendant described himself to Dr. Arias as being sad and depressed due to his current arrest. He denied any suicide attempts, but did have passive death wishes. He also claims to have a "jumbled up memory."

9

29.     The medical records from the Treasure Coast Rehabilitation Hospital relating to the Defendant's 1991 automobile accident were reviewed by Dr. Arias. The records reflect there was minimal improvement in the Defendant's visual memory at discharge. The medical reports reflect that the Defendant was continuing to make progress at discharge, but still displayed severe attention/concentration deficits. The Defendant received adjustment counseling after discharge from the hospital. His greatest deficits were visual processing and relative speed of response. At or about the time of discharge in 1991, the medical records reflect a moderate to severe deficit in short term memory and orientation, as well as moderate deficits in cognition specifically in the areas of problem solving, abstract reasoning and organization.

30.     Dr. Arias' report reflects the various tests that he performed on the Defendant. He examined the Defendant for approximately six and one-half hours over two sessions.

31.     The Defendant's verbal scale IQ is in the average range. His performance scale IQ is in the average range. His full scale IQ of 99 is also in the average range according to Dr. Arias.

32.     In respect to his attention and memory, the Defendant had borderline general memory scores. His immediate to delayed auditory memory was also in the borderline range. His immediate to delayed visual memory fell within the low average to borderline range. His working memory was low average. Dr. Arias states in his report that overall, these findings do represent a decline from previous levels of functioning prior to the 1991 accident.

10

33.     In respect to his "executive sub skills" Dr. Arias found the Defendant's conceptual reasoning was high average.  His visual psychomotor speed and rapid scanning was also high average. Letter number shifting was within the average range. However, his abstract concept formation requiring the use of fluid mental abilities was within the impaired range. Complex problem solving was within the expected range. His nonverbal abstract reasoning was high average. His social judgment and comprehension were average.

34.     In respect to the Defendant's language skills, his expressive vocabulary was average. His mental arithmetic was low average and his fund of information was average.

35.     Other areas examined by Dr. Arias in visuospatial/constructive sub skills were generally in the average or high average range. One area, being visual discrimination of important details, was moderately impaired.

36.     Based upon all of the results of the examinations, Dr. Arias was of the opinion that the Defendant had a traumatic permanent brain injury. His opinion is that the Defendant has memory problems which impact his ability to assist in his defense. There was no evidence of malingering based upon the two tests performed. Dr. Arias believes that the brain injury will not improve. The Defendant has emotional factors contributing to his problems which are depression associated with his court case.

37.     Dr. Arias' report states that the Defendant was forthright and honest in answering all of his questions. Dr. Arias states that given his current levels of cognitive deficits, it is imperative to allow the Defendant extra time in answering questions and it is quite possible that he will have difficulty in proceeding in his own defense of his current case.

38.     One of the issues that was raised with Dr. Arias during his testimony was how to explain the fact that the Defendant had very good memory, concentration and ability to respond to the questioning of law enforcement officers in October of 2005. Those answers that the Defendant gave the officers concerning the facts surrounding the charges herein necessitated both short term and long term memory. It required him to answer specific questions without delays and provide other details which would seem to be contrary to Dr. Arias' opinion that the Defendant has cognitive deficits to the degree that he is unable to assist his counsel. Dr. Arias stated that it is difficult for him to explain how the Defendant was able to discuss all of these things with law enforcement, but cannot recall that information now. Dr. Arias testified that it is very hard to give an opinion about this because he did not review the law enforcement reports as part of his evaluation nor did he discuss them with the Defendant during any of his sessions. This Court found that to be extremely important and even addressed a question to Dr. Arias in this regard.

39.     This Court specifically asked Dr. Arias if reviewing the law enforcement reports and discussing those with the Defendant would have assisted him in his evaluation and would have impacted his opinion. Dr. Arias responded that it would have assisted him and would have impacted his findings if he knew what the law enforcement offense reports stated about how the Defendant responded when confronted in October of 2005. However, he stated that he did not have that information during his examination nor did he have it when he rendered his findings set forth in his report.

40.     Secondly, this Court asked Dr. Arias if it would have assisted him to have specific information concerning the types of jobs the Defendant had over the years and what his duty functions were. This Court stated that it would seem that assistant manager

12

positions, as reflected on page 1 of Dr. Arias' report, would imply that the Defendant was in some sort of a supervisory capacity with several different businesses. This Court stated that it would seem that someone who would work for a bank, a Walgreen's or other service industry in a supervisory capacity, would have to possess the ability to process information, use memory and function on a daily basis. This would seem to be contrary to Dr. Arias' findings and for that matter, Dr. Kramer's findings.

41.    In response, Dr. Arias stated that the only information he had about the Defendant's employment is set forth on page 1 of his report. He did not discuss the duties or functions that the Defendant had to perform during his employment history which may have given Dr. Arias further insight as to what type of mental functions the Defendant had to utilize in these various jobs. However, he testified that he did not go into any of this information with the Defendant during his examination.

## DR. LANDRUM

42.    The sole expert presented by the government was Dr. Landrum. He is a clinical psychologist as is Dr. Arias. He was asked to provide a forensic psychological evaluation. His report is part of the record and is attached to [DE 43], Government's First Supplemental Response To The Standing Discovery Order.

43.    Dr. Landrum examined the Defendant at his office over a three hour period. As with Dr. Kramer and Dr. Arias, Dr. Landrum has performed hundreds of these types of examinations in the past. Further, Dr. Landrum had the benefit of being able to review the reports of Dr. Kramer and Dr. Arias prior to his examination of the Defendant on October 19, 2006. Additionally, Dr. Landrum had copies of the police reports, admitted in this hearing as Government's Composite Exhibit 1, as well as interviews with the Defendant's

13

mother and wife and other information as set forth in page 2 of Dr. Landrum's report.

44. In respect to the Defendant's employment, he told Dr. Landrum that he did hold various assistant manager positions with Walgreen Drugs, MacDonald's, Steak n' Shake, Radio Shack and Burger King. He also worked for an import broker, as a bank teller and managed a marketplace bank. The Defendant told Dr. Landrum that his longest period of sustained employment appears to be at Beall's department store where he worked for approximately one and one-half years. He told Dr. Landrum that the majority of his positions were held on an average of three to six months. He was fired from some positions and left others for better pay and opportunity. The history of his auto accident, his family background, marriage and child are all as previously given to Dr. Kramer and Dr. Arias.

45. Dr. Landrum stated that the Defendant appeared to be generally forthcoming and had little difficulty offering information in response to questions asked by Dr. Landrum. His memory deficits were clearly evident, although he was felt to be a fairly good historian according to Dr. Landrum. He completed all tasks requested of him and demonstrated good effort, concentration and perseverance. No unusual behavior was noted.

46. Dr. Landrum found the Defendant to be well oriented in respect to time, place, person and situation. The Defendant denied any homicidal or suicidal ideations. There is no evidence of any hallucinations. There is no evidence of confused mentation, loosening of associations, delusional thinking or psychotic thought. The recent and remote memory function were felt to be reasonably intact given his history of his head injury. Dr. Landrum found the Defendant's speech was unpressured and his thoughts were considered generally goal directed. His insight and judgment were unimpaired. His overall

14

affect was found to be appropriate in thought content. He was mildly depressed according to Dr. Landrum's report. The Defendant appeared to be of average intelligence.

47.     The six areas of competency that Dr. Kramer addressed in his report were addressed by Dr. Landrum as well. His results were as follows:

a.      The Defendant's appreciation of the charges against him is acceptable.

b.      The Defendant's appreciation of the range and nature of possible penalties is acceptable.

c.      The Defendant's understanding of the adversarial nature of the legal process is acceptable.

d.      The Defendant is able to manifest appropriate courtroom behavior.

e.      The Defendant's ability to disclose to his attorney facts pertinent to these proceedings is acceptable as Dr. Landrum found that the Defendant was able to give a consistent, rational and relevant account of his movements and mental state at the time of the alleged offenses.

f.      The Defendant's ability to testify relevantly is acceptable as Dr. Landrum found that the Defendant was able to testify with coherence, relevance, and independence of judgment.

48.     Based upon all of the foregoing, Dr. Landrum's opinion was that the Defendant had sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and that the Defendant had a rational as well as factual, understanding of the pending proceedings. He therefore found the Defendant to be competent to proceed to trial.

49.     Dr. Landrum testified that the Defendant has cognitive deficits, but they do not impair his ability to assist his attorney.  He also referred to Dr. Arias' report which reflected that the Defendant's overall cognitive functioning was in the average range even if it was in fact lower than before the accident in 1991.  The Defendant was in the borderline range in respect to some memory and functioning areas.  He also agreed with Dr. Arias' suggestion that working with the Defendant at a slower pace would increase the Defendant's ability to assist his counsel.

50.     Dr. Landrum testified that he did test for malingering.  While he could not say that the Defendant was in fact malingering, he did believe that the Defendant exaggerated some of his responses.  A couple of examples given in that regard by Dr. Landrum at hearing were that the Defendant said he could not remember what happened an hour ago, when in fact he and the Defendant were sitting there talking about things during the three hour session.  Another example given by Dr. Landrum was that the Defendant was able to give Dr. Kramer his address and cell phone number, but told Dr. Landrum that he could not provide that information to him.  Another example was that the Defendant told Dr. Landrum that he had problems recognizing members of his family, but there is absolutely no record of that anywhere else in any of the examinations performed by the other experts in this case. Another example was that the Defendant said that he could not remember the date, but Dr. Landrum testified he was able to give the specific date.   Dr. Landrum explained that the Defendant scored a 24 on these tests for malingering which was significantly above the recommended cutoff for someone and was indicative of a person who may be exaggerating or malingering.

16

51.     Dr. Landrum was asked at the hearing how to balance the Defendant's ability to tell law enforcement specific details in October of 2005 with the opinions of the other experts that the Defendant is unable to perform those mental functions at this time.  Dr. Landrum testified that he found absolutely no reason why the Defendant was not able to provide this same detail to Dr. Kramer and Dr. Arias as the Defendant provided to law enforcement officers in October of 2005.  The Defendant is no less competent now than he was at the time that he initially had contact with law enforcement officers in October of 2005. Dr. Landrum testified that the Defendant knows right from wrong and knew what he was doing was wrong.

52.     Dr. Landrum testified that he did discuss his employment history with the Defendant during his sessions.  The Defendant gave details of his duties and pay that he received for these jobs.  Further, the Defendant said that he left some of these jobs because of his functioning at the job and he left some jobs for better pay.  Dr. Landrum testified that the types of employment, the positions that the Defendant held and the job functions he performed, were consistent with someone who was competent to function and to stand trial.

53.     In respect to the suppression issue, Dr. Landrum's testimony was that the Defendant had the ability to consent to search, waive counsel and speak with law enforcement at the time that he was interviewed by them in October of 2005.

54.     On cross-examination, Dr. Landrum testified that the Defendant will require special effort by his attorney since the Defendant does process information at a slower rate. However, by asking the Defendant questions and waiting to give him time to respond will allow the Defendant to perform at an acceptable level in assisting his counsel at trial

17

and testifying. Dr. Landrum confirmed that he had spoken with the Defendant's attorney about some gaps in the Defendant's memory.

55.     Dr. Landrum testified that the Defendant told him about his arrest and recalled law enforcement coming to his business. However, he had no recollection of consenting to the search of the computer. He remembers being in the back of a patrol car, but does not recall discussing the seizure of the computer. He has no recollection of telling law enforcement about his history of viewing pornographic information on the Internet. The Defendant said that he did recall being asked by law enforcement to talk, but did not remember signing anything about that. The Defendant was able to recall downloading pornographic images and related this to Dr. Landrum.

56.     When asked by the Court as to what Dr. Landrum meant as to "special effort" by his attorney to assist the Defendant, Dr. Landrum responded that he meant to simply proceed at a slower pace. Counsel should make sure that the Defendant understands a question or statement before proceeding with the next one.

57.     In summary, Dr. Landrum's report states that the Defendant is without any significant psychopathology in terms of a formal thought or affective disorder. He did find situational depression. He did find that the Defendant suffers a cognitive disorder involving memory and adaptive functioning deficits secondary to a traumatic brain injury. Dr. Landrum's opinion is that within reasonable psychological probability, the Defendant was not suffering from any defect of reason as to being unable to distinguish right from wrong. Finally, Dr. Landrum's reports reflects that the Defendant has the sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and has a

18

rational, as well as factual, understanding of the pending proceedings. Therefore, Dr. Landrum found the Defendant to be competent to stand trial.

## MOTION TO SUPPRESS

58. As stated previously, counsel for the Defendant asserts that the Defendant is unable to provide her with any information or background concerning the alleged consent to seize his computer and/or make statements to the law enforcement officers at the time of the initial contact. Therefore, the Defendant, after reviewing all discovery provided in this case, agrees that the factual basis set forth in the government's response and in the law enforcement reports, admitted as Government's Composite Exhibit 1, do adequately and accurately set forth the underlying facts in this case. The Defendant argues that his mental condition, as testified to by his two experts, did not permit him to properly consent to either the search of his computer or to speak with law enforcement officers. This Court will set forth a brief underlying factual basis for the District Court as to the Defendant's initial contact with law enforcement which resulted in these charges.

59. On or about October 20, 2005, FBI Special Agent Rivas was accompanied by Indian River County Sheriff's Detectives Harmon and Dissis in respect to a pending investigation of transmission and receipt of child pornography by this Defendant. These officers initially went to the Defendant's residence and made contact with the Defendant's wife. They did not disclose specifically what they were going to discuss with the Defendant. The Defendant's wife informed the officers that the Defendant was at work at

19

Burger King. The officers then went to the Defendant's place of employment and discreetly asked if they could speak with him outside. He was able to do so.

60.     The Defendant confirmed to the officers that he had an America On Line (AOL) account two to three years prior to that date. He had previously resided in Tamarac, Florida, and had the AOL account there. He gave them a screen name that he used in connection with that account two to three years before. He advised the officers that the account was no longer active and that he presently had an Internet account with Comcast Cable.

61.     The officers showed the Defendant copies of five email messages with a screen name corresponding to the screen name that the Defendant stated that he had two to three years prior. There was also another screen name which the Defendant said he did not recognize. These emails had attached to them images of child pornography. When asked, the Defendant did not deny having sent any of those emails or images and acknowledged that he had probably sent them.

62.     The Defendant explained to the officers that he sent such pictures in hopes of receiving other pictures in return. When asked if any of these pictures could be found currently on his computer, the Defendant said that they might still be there since it was the same computer that he used two to three years ago. However, the Defendant asserted that he no longer engaged in that type of activity since his life had changed. He was now married and had a young daughter of his own. He also specifically told law enforcement that his wife was unaware of his prior involvement with viewing child pornography on line.

63.     The Defendant was asked if he would allow the investigating officers to take his computer for the purposes of examining its contents. The Defendant was not made

any promises. In fact, the Defendant was told that the outcome could be unfavorable to him and result in his arrest. Nevertheless, the Defendant agreed to give them his computer voluntarily and was driven to his residence. The officers made certain that the Defendant was informed that he was speaking with the officers on a voluntary basis and that he was under no legal obligation to cooperate or speak with the officers. The Defendant was told that he could terminate his cooperation at any time. However, the Defendant agreed to speak with the officers.

64. The Defendant insisted on traveling with the officers as opposed to taking his own vehicle so that the Defendant could save on gasoline. Therefore, the officers drove the Defendant to his residence. On the way to his residence, the Defendant stated that he did not want his wife to find out the true nature of the investigation at that time. Therefore, a "cover story" was agreed upon. The cover story would be that the Defendant was receiving threats over the Internet and these officers were responding to a complaint about those threats.

65. At his residence, the Defendant told his wife the aforementioned "cover story" that was made up on the way to his residence. He voluntarily gave law enforcement officers his computer and any associated storage media. The officers then drove the Defendant back to the Burger King where he was working.

66. On the way back to his place of employment, the Defendant admitted that he had recently opened a new AOL account using a free trial membership. He admitted that he had again began to visit sexually explicit chat rooms as most recently as the night prior. He also admitted to the officers that he had transmitted between ten to one hundred pictures of child pornography during that most recent on line session.

21

67.     The officers explained to the Defendant that it was a violation of law to do this and explained the associated penalties with this type of conduct.  The officers specifically stated that the greatest penalties would be for production of child pornography and the least penalties would be for possession of the pornography.  The Defendant responded that he believed he was in the latter of the two categories relating to possession of child pornography.  He specifically stated that he never molested any children nor had he ever produced any child pornography.  He apologized for his past conduct and assured the officers that he would never engage in that kind of conduct again.

68.     Upon returning to his place of employment, the Defendant signed a consent to search computer form authorizing the officers to review the contents of his computer.

## ANALYSIS

69.     The legal test for competency has been set forth by the United States Supreme Court in Dusky v. United States, 362 U.S. 402 (1960).  Most recently, the Eleventh Circuit Court of Appeals addressed this same issue in United States v. Nickels, 324 F.3d 1250 (11th Cir. 2003).  The Eleventh Circuit reiterated that the legal test for competency is whether the defendant had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he had a rational as well as factual understanding of the proceedings against him.  There is no presumption of incompetency and the defendant must demonstrate his incompetency by a preponderance of the evidence.  Battle v. United States, 419 F.3d 1292 (11th Cir. 2005).  Mental illness, as a matter of law, does not preclude a finding of competency to stand trial.

22

70.     The Eleventh Circuit in <u>Battle</u> stated specifically that the evidence presented by the defendant must indicate a present inability to assist counsel or understand the charges. Neither low intelligence, mental deficiency, bizarre behavior or history of mental illness can be equated with mental incompetence to stand trial. The court went on to state that not every manifestation of a mental illness demonstrates incompetence to stand trial. Further, the court stated that the standard of proof is high and that the facts must positively, unequivocally, and clearly generate the legitimate doubt that the defendant is competent to stand trial. <u>See</u> <u>Battle</u>, <u>supra</u>.

71.     In this case, there are obviously conflicting expert reports and expert opinions. When a District Court is faced with conflicting expert reports, it does not clearly err simply by crediting one opinion over another where other record evidence exists to support such a conclusion. <u>United States v. Jones</u>, 2006 WL 2946838 (11th Cir. 2006). Other evidence of record before this Court at the hearing as well as the testimony of the experts may be utilized to assist this Court in its analysis in accepting one opinion of an expert over another.

72.     The Court reviewed each of the three separate offense reports in Government's Exhibit 1. That exhibit consists of reports by FBI Special Agent Arias, Indian River County Detective Dissis, and Indian River County Detective Harmon. It is interesting to this Court that each of these reports was prepared separately, but the substance of the reports are virtually identical concerning the facts underlying the initial contact with the Defendant.

73.     The reports reflect that the Defendant was told that he did not have to cooperate and even if he chose to cooperate, he could end that cooperation at any time.

He was also advised that a search of his computer may result in charges be filed against him and his being arrested in this case. The officers even went as far as discussing the possible penalties that the Defendant faced, which is unusual.

74.     The reports all reflect that the Defendant had a specific recollection of issues which this Court would consider to be in his long term memory. These are issues concerning screen names and an AOL account that the Defendant stated he had not utilized for two to three years prior to this initial contact with the law enforcement officers. There were also questions answered by the Defendant which this Court views to involve the Defendant's short term memory. These questions revolve around what the Defendant was doing as recently as the night prior to this contact with law enforcement. The Defendant admitted that he was using a new AOL account and had transmitted images of child pornography as most recently as the night prior to the officers meeting with him.

75.     The reports also reflect an interesting fact to this Court that the Defendant had the present ability, concentration and processing of information to tell the officers that he did not want his wife to know what was going on. A story was concocted to give a false reason to his wife as to why the officers were going to be taking the Defendant's computer from his residence. This appears to show a high level of thought process. These reports do not depict the Defendant as blindly following orders of the officers or simply acquiescing to what they were asking. Rather, the reports reflect a lengthy interaction in conversations between this Defendant and the officers consistent with someone who is competent to assist his counsel at trial and testify.

76.     In respect to the six areas of competency evaluated by Dr. Kramer, one of the Defendant's experts, only two areas were found to be deficient. Those areas were that

Dr. Kramer believed the Defendant did not have the ability to assist his counsel at trial and testify. However, Dr. Kramer was not able to state specifically what the Defendant's state of mind was in October of 2005. Dr. Kramer testified that the Defendant's mental condition could have impacted his ability to consent to search of his computer, but Dr. Kramer was unable to say for sure if the Defendant was in fact unable to consent or waive his rights to counsel.

77.     It is also interesting to note that Dr. Kramer stated that the Defendant's inability to assist his counsel was not complete. Dr. Kramer explained that if the Defendant was given more time to answer questions or respond to inquiries, that such a process may result in acceptable competency to stand trial. Finally, in respect to Dr. Kramer's testimony, he confirmed that the Defendant stated that he had worked at various positions as an assistant manager. He had been fired from some of those positions because of poor job performance, but that he had also left some of those positions for better pay and opportunity.

78.     Dr. Arias specifically stated that while he believed that the Defendant had cognitive deficits, he could not explain how the Defendant was able to discuss both long term and short term details with law enforcement officers as reflected in the reports admitted herein as Government's Exhibit 1. While these reports were available, Dr. Arias did not have the benefit of these law enforcement reports nor did he review those with the Defendant during his evaluation process. He stated on the record in response to one of this Court's questions that having those reports and reviewing them with the Defendant not only would have been helpful to his analysis, but could have impacted his evaluation.

79.     Dr. Arias also admitted that he did not discuss with the Defendant the various jobs that he held over the years.  Dr. Arias did not discuss with the Defendant the specific duties or daily requirements of any of those jobs.  Some of those jobs were short term jobs of just a few months and some were of a significant period as long as a year or more as reflected in Dr. Landrum's report.  Dr. Arias was not able to give this Court a valid reason how someone with the alleged deficits that the Defendant purportedly has could be hired and work in a supervisory capacity for various employers, even if it was just for a few months.  Certainly, an individual that is hired by banking institutions, retail establishments, and even fast-food restaurants and who acts in a supervisory capacity, would have to have the necessary short term and long term memory and ability to process information in that job for even a very short period of employment.

80.     Dr. Arias also was of the opinion that if the Defendant was given extra time to answer questions it may allow the Defendant to be able to assist his attorney at trial.  It is also noted that the Defendant has an average IQ and his cognitive deficits are only in the moderate range according to Dr. Arias' report.

81.     In respect to the government's expert, Dr. Landrum, he also agreed that working slower with the Defendant in asking questions and processing information would be of assistance.  Dr. Landrum found that even though the Defendant had some cognitive deficits, that they did not impair his ability to assist his attorney at trial.

82.     Dr. Landrum testified that he believed the Defendant may have exaggerated in some of his responses.  Those specific examples were given by Dr. Landrum and this Court recited those previously herein.

83.     Dr. Landrum also testified that he discussed with the Defendant the various jobs and duties that the Defendant had in conjunction with his employment history. Dr. Landrum's opinion is that the jobs and duties were consistent with someone who is competent to function and stand trial. In respect to the suppression issue, Dr. Landrum's opinion was that the Defendant was able to consent to search and waive his rights concerning statements to the law enforcement officers at the time of the initial contact in October 2005.

84.     In respect to the Motion to Suppress, the Defendant was not in custody at any time on October 20, 2005. The officers spoke with the Defendant and advised him specifically that he did not have to cooperate or speak with them. Even if the Defendant did wish to speak with them, he was advised by the officers that he could end his cooperation at any time. Further, he was advised that he did not have consent to the seizure of his computer.

85.     The test for whether the Defendant is in custody for <u>Miranda</u> purposes is objective. It is whether or not a reasonable person in the Defendant's position would not feel free to leave. Here the Defendant had no restraint on his freedom. The officers were going to drive separately to the Defendant's house to retrieve his computer, but the Defendant asked to ride along in their vehicle to save gas. Secondly, the actual subjective beliefs of the officers and the Defendant as to whether or not he was free to leave are irrelevant. The standard is whether or not the Defendant in fact had the right to leave. Here, all of the evidence from Government's Exhibit 1, being the offense reports, reflects that the Defendant was not in custody at any point during this contact on October 20, 2005. Since there was no formal arrest or restraint of freedom of movement of the Defendant it

was not necessary that he be advised of his <u>Miranda</u> rights. <u>United States v. Brown</u>, 441. F.3d 1330 (11th Cir. 2006).

86.     This Court has found that the Defendant is competent to stand trial. However, even if the Defendant had a low IQ or other mental deficiencies, those by themselves, would not be sufficient to establish that any statements made by the Defendant were involuntary. The Court must look at the totality of the circumstances. <u>United States v. Gaines</u>, 987 F.Supp. 1432 (S.D. Fla. 1997). Simply because a defendant is suffering from a severe depression does not render a statement involuntary unless the agents took advantage of such mental illness. There was no evidence of any physical or psychological coercion nor any evidence that the officers even had any inkling that the Defendant was suffering from any mental impairment of any type.

87.     The Defendant's mental condition, by itself apart from its relation to any official coercion, should never be dispositive of an inquiry into constitutional voluntariness. Coercive police activity is necessary to predicate a finding that such a statement or confession is not voluntary. <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986).

88.     Even in a case where there was an individual suffering from severe depression, such a mental disability did not by itself render the defendant's consent to search and waiver of <u>Miranda</u> rights involuntary. There must be some coercion by an official actor to make the consent and/or waiver involuntary. <u>United States v. Barbour</u>, 70 F.3d 580 (11th Cir. 1995).

89.     In this case, the Defendant was fully advised that he did not have to consent to the search and seizure of his computer. He was advised of the consequences of a search of his computer should child pornography be found thereon. The Defendant was

28

advised by the officers that a finding of such evidence on his computer could result in his arrest. The officers even went so far as to discuss possible penalties for any such offenses ranging from creating the child pornography down to simple possession of the child pornography. There is nothing in the record to indicate any physical or psychological coercion by the officers in this case. The only evidence that this Court has is by virtue of the police reports, Government's Exhibit 1, which reflect that the Defendant knowingly and voluntarily consented to the search and seizure of his computer.

90.    In respect to the statements made by the Defendant, he was likewise informed that he did not have to cooperate or speak with the officers. He was further advised that if at any time he chose to end his statements or cooperation, he was free to do so. Nevertheless, the Defendant agreed to engage in conversation and speak with the officers. As stated previously, the Defendant was not in custody nor was his freedom restrained in any way, shape or form. Therefore, it was not necessary he be advised of his constitutional rights under Miranda.

91.    Based upon all of the foregoing, this Court finds that in respect to the Defendant's Request For Competency Hearing, the evidence does not clearly and unequivocally show that the Defendant is incompetent to stand trial. Instead, this Court finds that the evidence as related by this Court herein, more appropriately leads this Court to find that the Defendant is competent to stand trial and testify at trial. The Defendant did not meet his burden of proof in this regard.

92.    In respect to the Motion To Suppress, this Court finds that the Defendant's mental condition had no impact whatsoever on his ability to freely and voluntarily consent to the search and seizure of his computer. Additionally, the Defendant's mental condition

29

had absolutely no impact on his ability to freely and voluntarily cooperate, converse and discuss the case with the officers as is more particularly reflected in Government's Exhibit 1 herein.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant be found to be competent to stand trial and testify should he choose to do so in respect to the Defendant's Request For Competency Hearing [D.E. #27] and that the Defendant's Motion To Suppress [D.E. #35] be **DENIED**.

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable K. Michael Moore, United States District Judge assigned to this case.

**DONE AND SUBMITTED** this _30th_ day of November, 2006, at Fort Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. K. Michael Moore
AUSA Corey Steinberg
AFPD Robin Rosen-Evans

30